```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW HAMPSHIRE
```

Androscoggin Valley Regional
Refuse Disposal District

       v.

R.H. White Construction Co., Inc.

                                        Civil No. 15-cv-434-LM
                                        Opinion No. 2017 DNH 093

R.H. White Construction Co., Inc.

       v.

Sanborn, Head & Associates, Inc. et al.


## **O R D E R**

     Androscoggin Valley Regional Refuse Disposal District (the "District") brings suit against R.H. White Construction Co., Inc. ("R.H. White") alleging claims arising out of an agreement between the parties that provided for R.H. White to design and build a landfill gas processing facility.  R.H. White filed a third-party complaint (doc. no. 4) against nine entities that were also involved in the building and design of the facility, including Sanborn, Head & Associates, Inc. ("SHA").  SHA answered the third-party complaint and asserted three third-party counterclaims against R.H. White.  See doc. no. 42.

R.H. White moves to dismiss three claims asserted by the District, arguing that they fail to adequately state a claim for relief.  See doc. no. 91.  R.H. White also moves to dismiss two of the third-party counterclaims asserted by SHA on the same ground.  See doc. no. 92.

**Standard of Review**

Under Rule 12(b)(6), the court must accept the factual allegations in the complaint as true, construe reasonable inferences in the plaintiff's favor, and "determine whether the factual allegations in the plaintiff's complaint set forth a plausible claim upon which relief may be granted."  Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 71 (1st Cir. 2014) (citation omitted).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

**Background**[1]

The District owns and operates the Mount Carberry Landfill in Success, New Hampshire.  On September 12, 2011, the District

---

[1] These facts are drawn from the allegations in the District's amended complaint (doc. no. 77) and R.H. White's third-party complaint (doc. no. 4).

2

and R.H. White entered into an agreement (the "Agreement") in which R.H. White agreed to design and build a landfill gas compression and treatment facility (the "LFG Facility") at the Mount Carberry Landfill. The purpose of the LFG Facility was to treat and transport the landfill gas through a pipeline to the Gorham Paper and Tissue Mill, which would purchase the gas from the District.

In order to induce the District to enter into the Agreement, R.H. White made several representations in its response to the District's Request for Proposal ("RFP") and in the Agreement itself. Those representations included statements about R.H. White's expertise and ability to build and design the LFG Facility in accordance with the District's needs.

In 2012, R.H. White contracted with several companies to provide design and/or engineering services in connection with the construction of the LFG Facility. On July 5, 2012, R.H. White entered into an agreement with SHA (the "subcontract"), pursuant to which SHA was responsible for much of the overall engineering and design of the LFG Facility.

Under the terms of the Agreement and after several agreed-upon extensions, R.H. White was obligated to substantially complete its work on or before October 22, 2012. On November 5,

2012, R.H. White commenced startup of the LFG Facility, and the first day of landfill gas sales occurred on November 7, 2012.

The LFG Facility ran intermittently from November 7, 2012 through December 20, 2012. On December 21, 2012, the facility was shut down entirely because it was not working properly. From December 2012 through March 2014, the LFG Facility experienced frequent unexpected shutdowns caused by multiple failing components, including the regeneration cooler, the air heat exchanger on the compressor skid, the glycol cooler, the compressor motor, and the odorant system.

R.H. White asked SHA to perform an analysis of the LFG Facility to identify the cause of the problems. SHA determined that at least part of the problem arose when some of the landfill gas being sent through a part of the system, the dessicant dryer, was recycled back through the system (the "regeneration gas").

In early 2014, based on SHA's recommendation and design, R.H. White installed a "side flare" to divert and "burn off" the regeneration gas before it was sent through the LFG Facility. The purpose of the side flare was to determine if the regeneration gas was causing the clogging and corrosion problems in the various components of the system.

In March 2014, the side flare began operating, and the LFG Facility stayed "on line" consistently thereafter. R.H. White asked the District to deem the side flare a "permanent solution" to the problems the facility had experienced and an acceptable change to the original design. R.H. White also asked the District to pay it the $496,000 retainage fee it had held back pending completion of the project. The District did not deem the side flare an acceptable permanent solution, because it reduced the amount of landfill gas that was supposed to be treated and eventually sold, and did not pay R.H. White the retainage fee.

While the District and R.H. White attempted to resolve the dispute, the District noticed staining of soil, metal roofs, and equipment in the area immediately beneath and surrounding the side flare. The District tested the stained soil, which showed elevated levels of certain heavy metals, including arsenic, chromium, lead, and nickel. The contamination levels are highest at the point of the side flare, which is consistent with the side flare being the cause of the contamination.

The District informed the New Hampshire Department of Environmental Services ("DES") of its soil testing findings. Based on initial discussions with DES, the District expects that it will need to remediate the contaminated topsoil around the

side flare and that it will likely need to discontinue the side flare or redesign it to preclude further contamination. The District's engineers have begun trying to redesign the side flare, but even if successful, some landfill gas will still be diverted from the pipeline, leaving the District with less gas to sell than what was contemplated under the Agreement.

Under the original terms of the Agreement, the District was obligated to pay R.H. White $2,108,130, plus an additional $160,000 for ledge removal. After several "change orders," the total price under the Agreement rose to $3,275,508.40.

**Discussion**

R.H. White moves to dismiss three of the District's claims (doc. no. 91) and two of SHA's third-party counterclaims (doc. no. 92). The court addresses these motions separately below.

I.  Motion to Dismiss District's Claims

The District asserts nine claims against R.H. White in its amended complaint: (1) Breach of Contract (Count I); (2) Breach of the Implied Covenant of Good Faith and Fair Dealing (Count II); (3) Breach of the Implied Warranty of Fitness for a Particular Purpose (Count III); (4) Negligence (Count IV); (5) Violation of the New Hampshire Consumer Protection Act ("CPA"), N.H. Rev. Stat. Ann. ("RSA") Ch. 358-A (Count V); (6) Breach of Express Warranty (Count VI); (7) Breach of Implied Warranty of

Good Workmanship (Count VII); (8) Negligent Misrepresentation (Count VIII); and (9) Unjust Enrichment/Quantum Meruit (Count IX). R.H. White moves to dismiss Counts V, VIII, and IX. The District objects.

A. <u>Violation of the CPA (Count V)</u>

R.H. White moves to dismiss the District's CPA claim, asserting that the allegations underlying the claim simply restate a breach of contract claim, and that the allegations fail to meet the well-recognized "rascality test." In response, the District contends that the rascality test does not apply here, because it is alleging that R.H. White committed one of the acts specifically proscribed by RSA 358-A:2, not that R.H. White's conduct was an otherwise unspecified "unfair method of competition or unfair or deceptive act or practice."

The CPA makes it "unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." RSA 358-A:2. Beyond that, the CPA specifically proscribes 16 different deceptive acts or practices, including "[r]epresenting that goods or services have . . . characteristics . . . or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that such person does not have," RSA 358-A:2, V, and "[r]epresenting

7

that goods or services are of a particular standard, quality, or grade . . . if they are of another," RSA 358-A:2, VII. The District asserts that it is relying on these two provisions for its CPA claim in Count V, and not on another unspecified act or practice that would be subject to the New Hampshire Supreme Court's rascality test. See Beer v. Bennett, 160 N.H. 166, 171 (2010) ("The rascality test is used to determine 'which commercial actions, not specifically delineated, are covered by the [CPA].'" (quoting ACAS Acquisitions v. Hobert, 155 N.H. 381, 402 (2007))).

In order to state a claim under RSA 358-A:2, V or RSA 358-A:2, VII, a plaintiff must allege that a defendant made a representation, "with actual knowledge of its falsity or reckless disregard for its truth, with the intent to induce" the plaintiff to enter into a transaction. Brace v. Rite Aid Corp., No. 10-cv-290-LM, 2011 WL 635299, at *3 (D.N.H. Feb. 4, 2011) (discussing Kelton v. Hollis Ranch, LLC, 155 N.H. 666 (2007) and Beer, 160 N.H. 166). In its objection, the District asserts that it has sufficiently alleged a violation of RSA 358-A:2, V and RSA 358-A:2, VII, because the amended complaint alleges:

> that R.H. White promised that the LFG Facility would be of a particular standard or grade (i.e., a fully functioning LFG Facility) and that the LFG Facility it built would have the characteristics, uses and benefits of a fully functioning LFG Facility; however, the plant R.H. White actually built was not of that

> standard and did not have those characteristics, uses, or benefits.

Doc. no. 93 at 7-8 (citing paragraphs 50-52 and 54 of the amended complaint). In other words, in support of its CPA claim, the District alleges that R.H. White represented that it could and would construct the LFG Facility according to certain standards, but that it failed to do so.

Missing from the District's CPA claim is an allegation that R.H. White made a misrepresentation with <u>actual knowledge</u> of its falsity or <u>reckless disregard</u> for its truth, with the intent to induce the District to enter into the Agreement. Though the amended complaint alleges in support of the CPA claim that R.H. White represented that it could build the LFG Facility in accordance with the terms of the Agreement and that it failed to do so, it does not allege that R.H. White <u>knew or was reckless in not knowing</u> that it could not do so at the outset of the Agreement. Thus, those allegations fail to give rise to a CPA claim. See Private Jet Servs. Grp., Inc., No. 05-cv-98-JD, 2006 WL 2864057, at *5 (D.N.H. Oct. 5, 2006) ("An ordinary breach of contract claim does not present an occasion for the remedies under the Consumer Protection Act." (quoting Barrows v. Boles, 141 N.H. 382, 390 (1996))); see also Brace, 2011 WL 635299, at *5 ("[I]t is not a CPA violation to sell bad goods or services; the CPA is implicated only when a seller induces the purchase of

such goods through the use of deception.").[2]  Accordingly, Count V is dismissed.

   B.   Negligent Misrepresentation (Count VIII)

R.H. White moves to dismiss the District's negligent misrepresentation claim, asserting that the amended complaint fails to allege any specific misrepresentations apart from the alleged misrepresentations in the Agreement.  R.H. White contends that a negligent misrepresentation claim based on statements in a contract is duplicative of a breach of contract claim and must be dismissed.  In response, the District asserts that it has alleged that R.H. White made certain misrepresentations about its ability and expertise without which the District would not have entered into the Agreement.

---

[2] As discussed below, the District alleges in support of its negligent misrepresentation claim that R.H. White knew or should have known that it could not provide the District with a functioning LFG Facility.  See doc. no. 77 at ¶ 73.  Even if that allegation could support a CPA claim, it is not the basis of the District's CPA claim as alleged in the amended complaint. The District does not reference that allegation with regard to its CPA claim in its objection or its surreply, and characterizes its CPA claim as being based on R.H. White's failure to deliver on its promise to build a functioning LFG Facility.  Because the District does not advance the argument in its objection or surreply that this subsequent allegation could support or is the basis for its CPA claim, the court does not address that argument here.  See Coons v. Indus. Knife Co., Inc., 620 F.3d 38, 44 (1st Cir. 2010) (The First Circuit has "emphasized that judges are not obligated to do a party's work for him, 'searching sua sponte for issues that may be lurking in the penumbra of the motion papers.'" (quoting United States v. Slade, 980 F.2d 27, 31 (1st Cir. 1992))).

Under New Hampshire common law, the elements of a claim for negligent misrepresentation "are a negligent misrepresentation of a material fact by the defendant and justifiable reliance by the plaintiff." Wyle v. Lees, 162 N.H. 406, 413 (2011) (citing Snierson v. Scruton, 145 N.H. 73, 78 (2000)). Moreover, "[i]t is the duty of one who volunteers information to another not having equal knowledge, with the intention that he will act upon it, to exercise reasonable care to verify the truth of his statements before making them." Id.

A plaintiff cannot recover damages in tort for a negligently performed contract.[3] See Plourde Sand & Gravel v. JGI Eastern, Inc., 154 N.H. 791, 794 (2007). However, "New Hampshire law recognizes that the procuring of a contract or conveyance by means of fraud or negligent misrepresentation is an actionable tort . . . ." Van Der Stok v. Van Voorhees, 151 N.H. 679, 681–82 (2005) (quoting Nashua Trust Co. v. Weisman, 122 N.H. 397, 400 (1982)). Thus, when "the plaintiff alleges that the defendant's misrepresentations induced him to enter the contract . . . the claim does not duplicate a breach of contract claim" and a plaintiff's negligent misrepresentation claim is viable. Johnson v. Capital Offset Co., No. 11-cv-459-JD, 2013

---

[3] This rule is generally known under New Hampshire law as the economic loss doctrine. See Wyle, 162 N.H. at 410.

11

WL 5406613, at *3 (D.N.H. Sept. 25, 2013) (citing Wyle, 162 N.H. at 411).

The amended complaint alleges that R.H. White represented both in its response to the District's RFP and in the Agreement itself that "it had the necessary experience and ability to complete the Work and to provide the District with a fully functional and reliable LFG Facility." Doc. no. 77 at ¶ 71. It also alleges that the "District reasonably and foreseeably relied upon R.H. White's representations in its RFP to enter in the Design/Build Agreement with R.H. White." Id. In addition, the amended complaint alleges that "R.H. White knew or should have known that its representations were not correct and it could not provide the District with an LFG Facility that was functional and reliable." Id. at ¶ 73.

The District's allegations support a cause of action for negligent misrepresentation separate from a breach of contract action. See Deutsche Bank Nat'l Trust Co. v. Fadili, No. 09-cv-385-LM, 2011 WL 4703707, at *17 (D.N.H. Oct. 4, 2011). Therefore, R.H. White's motion to dismiss is denied as to the negligent misrepresentation claim in Count VIII.

C. Unjust Enrichment/Quantum Meruit (Count IX)

R.H. White moves to dismiss Count IX of the amended complaint, asserting that the parties' relationship was governed

by the Agreement, which precludes a quasi-contract claim such as unjust enrichment or quantum meruit. In its objection, the District asserts that it is entitled to plead alternative theories of recovery and that it can recover in quasi-contract even when there is an express agreement governing the parties' rights.

"A valid claim in quantum meruit requires that (1) services were rendered to the defendant by the plaintiff; (2) with the knowledge and consent of the defendant; and (3) under circumstances that make it reasonable for the plaintiff to expect payment." Gen. Insulation Co. v. Eckman Constr., 159 N.H. 601, 612 (2010) (internal quotation marks omitted). "A plaintiff is entitled to restitution for unjust enrichment if the defendant received a benefit and it would be unconscionable for the defendant to retain that benefit." Id. at 611 (internal quotation marks omitted). Unjust enrichment and quantum meruit are equitable remedies that are not available if the parties' relationship is controlled by an express contract. See, e.g., Turner v. Shared Towers VA, LLC, 167 N.H. 196, 202 (2014).

As discussed above, the District alleges, and R.H. White agrees, that the parties entered into the Agreement which set forth R.H. White's obligations to build the LFG Facility. "Because that transaction was made pursuant to a contract, the

13

equitable remedy of restitution does not apply."[4] Moulton v. Bane, No. 14-cv-265-JD, 2015 WL 7274061, at *9 (D.N.H. Nov. 16, 2015) (citing Turner, 167 N.H. at 202 and Coldwell Banker Real Estate, LLC v. Brian Moses Realty, Inc., 752 F. Supp. 2d 148, 169 (D.N.H. 2010)); see also Lovy v. Fed. Nat'l Mortg. Ass'n, No. 13-cv-399-SM, 2014 WL 1669137, at *8 (D.N.H. Apr. 28, 2014).[5] Therefore, Count IX is dismissed.

D.   Summary

Accordingly, R.H. White's motion to dismiss (doc. no. 91) is granted as to Counts V and IX, but denied as to Count VIII.[6]

---

[4] The District's assertion that it may plead inconsistent theories of recovery is misplaced. There is no dispute in this case that the parties entered into the Agreement and that the Agreement governed the subject matter of the case. The District does not allege that R.H. White performed any work outside of the scope of the Agreement. Because R.H. White concedes that the parties had a valid contract as the District alleges, there is no basis for the District's quasi-contract theory.

[5] The District cites Bushkin Assoc., Inc. v. Raytheon Co., 815 F.2d 142, 149 (1st Cir. 1987) in support of its theory that a plaintiff can recover under quantum meruit despite the existence of a valid contract. Bushkin, however, holds that under Massachusetts law, "restitution on quasi-contractual grounds often enters into the remedial calculus in a contractual context." Id. In other words, Bushkin holds that a plaintiff can, in certain circumstances, recover for the fair value of his services as a remedy for a breach of contract claim. It does not hold that a separate quasi-contract claim can proceed despite the existence of a valid contract.

[6] The District contends that R.H. White has brought counterclaims for unjust enrichment/quantum meruit and negligent misrepresentation against the District and, if the court dismisses either Count VIII or Count IX, it should similarly

14

II. Motion to Dismiss Third-Party Counterclaims

SHA asserts three third-party counterclaims against R.H. White: (1) Breach of Contract (Counterclaim I); (2) Unjust Enrichment/Quantum Meruit (Counterclaim II); and (3) Indemnification (Counterclaim III). R.H. White moves to dismiss Counterclaims II and III to the extent Counterclaim III is based on a theory of implied-in-law indemnification. SHA objects.

A. Unjust Enrichment/Quantum Meruit (Counterclaim II)

R.H. White moves to dismiss Counterclaim II, asserting that its relationship with SHA was governed by the subcontract, which precludes a quasi-contract claim such as unjust enrichment or quantum meruit. In its objection, SHA repeats the District's arguments regarding its right to recover under a quasi-contract theory despite the existence of a valid agreement. It also notes that it has alleged that it performed services for R.H. White outside the scope of the subcontract.

For the reasons discussed above, because the parties agree that they entered into the subcontract which set forth SHA's obligations to provide services related to the design of the LFG

---

dismiss the corresponding counterclaims. The District did not move to dismiss R.H. White's counterclaims, and its attempt to do so summarily in its objection is improper.

15

Facility, SHA cannot recover under a quasi-contract theory for that work.  Therefore, to the extent SHA seeks to recover in Counterclaim II for any work performed under the subcontract with R.H. White, that counterclaim is dismissed.

However, "[u]njust enrichment may be available to contracting parties . . . where the benefit received was outside the scope of the contract." Clapp v. Goffstown Sch. Dist., 159 N.H. 206, 211 (2009) (citing Restatement of Restitution § 107(1) (1937) and Restatement (Third) of Restitution and Unjust Enrichment § 2 comment c at 16 (Discussion Draft, 2000)).  SHA alleges that it has provided R.H. White "with additional services since the Project was substantially completed" and that it did so "in reliance on the representations of [R.H. White] that the services would be paid for."  Doc. no. 42 at 20.  SHA further alleges that R.H. White has not paid it for those services.  Thus, SHA alleges that it performed services for R.H. White outside the scope of the subcontract, and it may seek to recover the fair value of those services under a quasi-contract theory.

Accordingly, R.H. White's motion to dismiss is granted as to Counterclaim II to the extent SHA seeks to recover in quasi-contract for work performed pursuant to the subcontract.  R.H.

White's motion to dismiss is denied as to the remainder of Counterclaim II.

B. Implied Indemnification

In Counterclaim III, SHA alleges that R.H. White "has a duty, as implied in law, and as expressly set forth in the Subconsultant Agreement with SHA, to indemnify, defend and hold SHA harmless from all damages, losses, or claims associated with [R.H. White's] negligence and that of its agents and subcontractors on the project." Doc. no. 42 at 21. R.H. White moves to dismiss Counterclaim III to the extent it is based on a theory of implied indemnification, because the subcontract has an express indemnification provision.

In response to R.H. White's motion, SHA asserts that it is entitled to plead inconsistent theories of recovery. There is no dispute, however, that SHA and R.H. White entered into the subcontract that expressly defined R.H. White's indemnification obligation. Because the parties expressly included an indemnification provision in their agreement, that provision supplants an implied-in-law duty of indemnification. See, e.g., CSX Transp., Inc. v. Mass. Bay Transp. Auth., 697 F. Supp. 2d 213, 225 (D. Mass. 2010) (holding that an indemnification provision in the parties' agreement supplants the common-law duty of indemnification because, were "this not the case, much

17

of [the indemnification provision] would be meaningless, because a party could seek indemnification under common-law principles even if it was not entitled the indemnification under the express and specific terms of the agreement").[7]

As noted above, however, SHA alleges that it performed work for R.H. White outside the scope of the subcontract. To the extent SHA may have liability based on that work, it would not be governed by the indemnification provision in the subcontract. Therefore, SHA's implied-in-law indemnification claim asserted in Counterclaim III may proceed to the extent it is based on indemnification for liability for work performed outside of the subcontract.

Accordingly, R.H. White's motion to partially dismiss Counterclaim III is granted to the extent it seeks to dismiss the implied-in-law indemnification claim based on work performed pursuant to the subcontract, and is otherwise denied.

---

[7] As the parties note, the New Hampshire Supreme Court has not addressed the specific issue of whether a written agreement containing an indemnity provision displaces the parties' rights to implied-in-law indemnity. Despite the absence of a controlling decision by the New Hampshire Supreme Court, New Hampshire law regarding the effect of explicit contractual provisions is sufficiently clear to allow this court to predict how the New Hampshire Supreme Court would rule on the issue. See, e.g., Porter v. Countrywide Home Loans, Inc., No. 13-cv-429-JD, 2014 WL 4450043, at *1 (D.N.H. Sept. 10, 2014).

**Conclusion**

For the foregoing reasons, R.H. White's motion to dismiss claims asserted in the amended complaint (doc. no. 91) is granted as to Counts V and IX, but denied as to Count VIII. R.H. White's motion to dismiss third-party counterclaims asserted in SHA's third-party complaint (doc. no. 92) is granted as to Counterclaim II and Counterclaim III to the extent those Counterclaims are based on work performed pursuant to the parties' agreement, and is otherwise denied.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

May 8, 2017

cc: All counsel of Record